E9MJVARH                        Hearing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SAJU VARGHESE,

4                  Plaintiff,

5             v.                        14 Civ. 1718 CM

6   JP MORGAN CHASE & CO., et al.,

7                  Defendants.

8   ------------------------------x

9                                      September 22, 2014
                                       9:35 a.m.
10

11

12  Before:

13                     HON. COLLEEN McMAHON,

14                                     District Judge

15

16                     APPEARANCES

17

18  OUTTEN & GOLDEN, LLP (NYC)
         Attorneys for plaintiff
19  BY:  JUSTIN MITCHELL SWARTZ, Esq.
         DEIRDRE ANNE AARON, Esq.
         – and –
20  LAW OFFICES OF KARL J. STOECKER
    BY:  KARL J. STOECKER, Esq.
21                  Of counsel

22  MORGAN LEWIS & BOCKIUS, LLP (NEW YORK)
         Attorneys for defendants
23  BY:  THOMAS ANTON LINTHORST, Esq.
         SAM SCOTT SHAULSON, Esq.
24                  Of counsel

25

1            (In open court)

2            (Case called)

3            THE COURT:  Have a seat.

4            All right.  Well, it is my understanding that the

5   plaintiff, the named plaintiff in this case, which I believe

6   has not yet been conditionally certified, wishes to withdraw

7   his claims with prejudice against JP Morgan Chase.

8            Is that correct?

9            MR. SWARTZ:  That's correct, your Honor.

10           THE COURT:  All right.  Well, this is a case that has

11  a bit of history.  At the initial pretrial conference in this

12  case, I called counsels' attention to the case of Pippin v.

13  KPMG, Pippin versus KPMG, a similar junior management level,

14  professional level FSLA case, and suggested -- which case I

15  believe has been heard by the Second Circuit -- and suggested

16  that -- well, I called it to counsels' attention and suggested

17  that counsel would need to evaluate the claims in light of

18  that.

19           Ever since that time, counsel has been doing his

20  darnedest to get his case away from me.  I don't know why.

21  Pippin is now the law of the circuit, but he has tried to get

22  the case away from me, first trying to move it to the Eastern

23  District of New York on the grounds that was a place where it

24  should have been brought in the first place.  It quite possibly

25  should have since, as I understand it, Mr. Varghese worked in

E9MJVARH                          Hearing

1   the Eastern District of New York.

2              Morgan Stanley opposed that.

3              And now we have the named plaintiff asking to give up

4   his claims, walk away with nothing and a promise that he will

5   never ask for anything up to and including today.  That's a

6   fairly substantial thing for someone to do, and I am not

7   willing to allow that to happen until Mr. Varghese gets on the

8   stand and tells me that is what he wants to do and until I am

9   sure he understands what his rights are.

10             He brought a lawsuit.  He claims he has been underpaid

11  for many years.  There is a not insubstantial amount of money

12  involved, and yet he now professes to be willing to walk away

13  without a dime and with no prospect of getting a dime.  He

14  should if that is what he wants to do.

15             So call your client.

16             MR. SWARTZ:  Thank your Honor.  I call Saju Varghese

17  to the stand.

18             THE COURT:  Mr. Varghese, won't you come up, please.

19   SAJU VARGHESE,

20       called as a witness by the Plaintiff,

21       having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23             THE COURT:  Have a seat.  Make yourself comfortable.

24             THE WITNESS:  Thank your Honor.

25  BY MR. SWARTZ:

E9MJVARH                          Varghese - direct

1    Q.  Good morning, Mr. Varghese.

2    A.  Good morning.

3    Q.  Did you at some point work for JP Morgan Chase?

4    A.  Did I what?

5    Q.  Did you work for JP Morgan Chase?

6    A.  Yes.

7    Q.  What was your job title there, most recent job title?

8    A.  I was working as an assistant branch manager.

9    Q.  At some point, sir, you decided to file a lawsuit

10   against --

11            THE COURT:  Let me clarify.  When did you work for JP

12   Morgan?

13            THE WITNESS:  The last 29 years.

14            THE COURT:  29 years?  When did you stop working for

15   JP Morgan?

16            THE WITNESS:  October 2013.

17            THE COURT:  Why was that?

18            THE WITNESS:  I was terminated.

19            THE COURT:  How long were you an assistant branch

20   manager?

21            THE WITNESS:  If I remember, 11 or 12 years.

22            THE COURT:  Thank you.  Now you may proceed.

23   BY MR. SWARTZ:

24   Q.  Sir, at some point you decided to bring a lawsuit against

25   JP Morgan Chase for unpaid overtime, right?

1   A.  That's correct.

2   Q.  Why did you decide to bring that lawsuit?

3   A.  Because when I was working as an assistant branch manager,

4   I was considered more like a teller-supervisor for a lot of

5   work most of the time and I wasn't paid --

6           THE COURT:  You did teller work most of the time?

7           THE WITNESS:  Yes.

8   A.  I would say 60 percent, 70 percent I was a teller, we used

9   to spend so much time and I wasn't compensated for that.

10  BY MR. SWARTZ:

11  Q.  At some point, sir, you decided you did not want to

12  continue to prosecute your claims in this case, you wanted to

13  drop the case.  Is that right?

14  A.  Yes, that's right.

15  Q.  Why did you make that decision?

16  A.  I made that decision because I realized it is bringing so

17  much stress on me --

18          THE COURT:  Sir, do me a favor.  Move back a little

19  bit from the mike.  It reverberates, and the court reporter and

20  I are having difficulty.

21  A.  I decided to drop the case because I realized this is

22  putting so much pressure and stress on me, and recently I

23  started working the night shift, even including yesterday and

24  the day before all night, all night I was working.

25          THE COURT:  Who are you working for now?

1          THE WITNESS:  I work for mail sorting.

2          THE COURT:  Mail sorting?

3          THE WITNESS:  Yes, at night.  It is putting so much

4    pressure on me, and now I realize I don't have the time and

5    energy and resources to compete with the Chase legal team.

6    BY MR. SWARTZ:

7    Q.  Is there any other reason that you decided to drop your

8    case?

9    A.  I put everything on my declaration when I --

10         THE COURT:  Why don't you forget about the

11   declaration.  Tell me every reason you can think of why you

12   gave up the case.

13         THE WITNESS:  Yes.

14         THE COURT:  Why you want to give up the case?

15         THE WITNESS:  The main reason, it is putting so much

16   stress on me.  Like I said, I don't have the resources, I don't

17   have the time, and now I work like nighttime.  Even now I am

18   sleepy.  Sorry for that.

19         The night shift I am working, and then I realize I am

20   sorry to say, your Honor, I looked at some reviews about you,

21   and that, that made me reticent.  I apologize for my feelings.

22         THE COURT:  You didn't want me to be your judge?

23         THE WITNESS:  No.  I mean that was a little bit

24   alarming when I saw that.  I thought it was better to drop the

25   case and to walk away.

1      THE COURT:  Because you didn't want me to be the

2  judge?  You were alarmed at the prospect I would be your judge?

3      THE WITNESS:  I was confused because I don't know how

4  it will turn out to be.

5      THE COURT:  True, no one, no one knows how the case

6  will turn out to be at the beginning, no one knows at all.

7  Every case is that way.

8      THE WITNESS:  Yes.

9      THE COURT:  There are legal precedents that might give

10  you a clue this way or that way, but no one knows how a case is

11  going to end.

12      THE WITNESS:  I thought I will step out, and I

13  strongly believe in my case, I strongly, strongly believe.  I

14  think the ABMs are just about the tellers, the lower employees,

15  they should be compensated for the time that they put, but I

16  don't think I have the resource or capacity to deal with the

17  process, your Honor.

18      THE COURT:  Do you have any other questions for your

19  client?

20      MR. SWARTZ:  No.  That is all.  Thank your Honor.

21      THE COURT:  Really?  That is that all the questions

22  you have for your client?

23      MR. SWARTZ:  I believe so, your Honor.

24      THE COURT:  I have a number, but we'll start with JP

25  Morgan.

1   CROSS-EXAMINATION

2   BY MR. LINTHORST:

3   Q.   Good morning, Mr. Varghese.

4   A.   Good morning.

5   Q.   My name is Tom Linthorst, and I am the lawyer representing

6   JP Morgan Chase in the lawsuit you have brought.

7        You have been placed under oath and you're sworn to

8   tell the truth.  Do you understand that?

9   A.   Yes.

10  Q.   Do you understand that the testimony you're giving here

11  today is subject to the penalties of perjury?

12  A.   Yes.

13  Q.   At the time you filed the case, you believed you had a

14  valid claim for overtime, right?

15  A.   Yes.

16  Q.   You decided to file that case and pursue the case not only

17  on your own behalf, but on behalf of other Chase assistant

18  branch managers?

19  A.   Yes, that would be, I believe, yes.

20  Q.   If I use the term "ABM," can we agree that means assistant

21  branch manager?

22  A.   Yes.

23  Q.   You understood in seeking to proceed as a collective action

24  on behalf of other assistant branch managers, that you were

25  seeking to represent them and protect their interests.  Is that

E9MJVARH                        Varghese - cross

1   correct?

2   A.  That's right.

3   Q.  You understood that you would be filing your case in this

4   Court, which is the Federal Court in Manhattan called the

5   Southern District of New York?

6   A.  Yes.

7   Q.  That's right?

8           At the time that you brought the case, you understood

9   what would be expected of you in litigating the case?

10  A.  Yes.

11  Q.  Did you understand that you would have to provide documents

12  relevant to your claim?

13  A.  Yes.

14  Q.  Did you understand you would have to answer written

15  questions from Chase relevant to your claim?

16  A.  Yes.

17  Q.  Did you understand you would have to answer questions at a

18  deposition?

19  A.  Yes.

20  Q.  If the case went to trial, did you understand you would

21  have to give testimony at trial?

22  A.  Yes.

23  Q.  At the time you brought the action, you were willing to do

24  everything needed to prosecute the case?

25  A.  Can you rephrase that.

1  Q.  At the time that you brought the case, you were willing to

2  do all those things that would be needed to move your case

3  forward?

4  A.  Yes.

5  Q.  At the time you brought the action, did you have an

6  understanding how much you could recover if you win your

7  claims?

8  A.  No.

9  Q.  Did you have any understanding today of how much you could

10 recover if you win your claims?

11 A.  Not exactly.

12         THE COURT:  I am sorry.  I didn't understand you?

13         THE WITNESS:  No, I don't have a calculation on that,

14 no.

15 BY MR. LINTHORST:

16 Q.  Do you know whether, if you win all of your claims, you

17 could recover more than $5,000.00?

18 A.  It will be, yes, because I put so many hours.

19 Q.  Do you know if you recover on all of your claims, if you

20 could recover more than $10,000.00?

21 A.  I would say, yes.

22 Q.  What is your estimate or expectation of what you could

23 recover if you win all of your claims?

24 A.  That will be based on the time I put.  I have no -- I don't

25 have any record of that.

E9MJVARH                          Varghese - cross

1   Q.  Do you know whether you could recover more than $20,000?

2   A.  I don't know at this point.  I don't know.

3   Q.  Did you believe it was over $10,000.00?

4   A.  I assumed so.

5   Q.  I am sorry?

6   A.  I think so, yes.

7   Q.  I take it that would be a substantial amount of money for

8   you?

9   A.  Can you rephrase that.

10  Q.  Is $10,000.00 a lot of money?

11  A.  Not exactly, no.

12  Q.  How much did you make a year at Chase?

13  A.  61,000.

14  Q.  At the time that you brought the action, did you intend to

15  proceed in the case until the court reached a decision on your

16  claims?

17  A.  Can rephrase that.  I am sorry.

18  Q.  Yes.  At the time that you filed the lawsuit, did you

19  intend to continue it until the end?

20  A.  Yes, I did.

21  Q.  The complaint lists Karl Stoecker as your lawyer.  Was he

22  your only lawyer at that time?

23  A.  At that time, I met with him early, initially.

24  Q.  Did you have any other lawyer representing you at the time

25  you brought the case?

1    A.  Not directly.

2    Q.  How about indirectly?

3    A.  Maybe, yes.

4    Q.  Who was the lawyer that may have indirectly represented you

5    at the time that you brought the case?

6    A.  Karl consulted with other people.

7    Q.  Do you know who Karl consulted with?

8    A.  That is, that is attorney-client privilege.  Can I avoid

9    that?

10   Q.  If your counsel has an objection, he will make an

11   objection.  The question is, do you know who Mr. Stoecker

12   consulted with who may have represented you indirectly in

13   bringing this lawsuit?

14   A.  Yes, at some point Karl talked to Deirdre.

15   Q.  Ms. Aaron from the Outten & Golden firm?

16   A.  Yes.

17   Q.  Do you know whether that was before or after you brought

18   the case?

19   A.  I don't remember exactly.

20   Q.  How did you find Mr. Stoecker as your attorney?

21   A.  His name was on the unemployment list that every department

22   published, they give a handout.  I used that handout.

23   Q.  You did not know Mr. Stoecker before you --

24   A.  Not personally, no.

25   Q.  Did there come a time when there was another former Chase

1    ABM who wanted to join this case?

2    A.  I wasn't sure about that.

3    Q.  Did you ever hear that there was another Chase ABM that

4    wanted to join the case?

5    A.  I didn't know exactly that it is --

6            MR. SWARTZ:  Objection.  Please make sure you don't

7    reveal any --

8            THE COURT:  Please make sure you don't talk directly

9    to your the witness even though he is your client!

10            MR. SWARTZ:  Thank your Honor.

11   BY MR. LINTHORST:

12   Q.  Did you know at some point another former Chase ABM wanted

13   to join this case?

14   A.  I didn't know this, no.

15   Q.  Did you know who Mr. Digilov is?

16   A.  Who?

17   Q.  Mr. Digilov?

18   A.  No.

19   Q.  Have you ever heard of that name before?

20   A.  No.

21   Q.  Do you know whether Mr. Digilov intended to join this case?

22   A.  No, I didn't know.

23   Q.  Do you know whether your attorneys advised the court that

24   you would be amending your complaint to add Mr. Digilov as a

25   plaintiff?

1              MR. SWARTZ:  Objection; attorney-client privilege.

2              THE COURT:  The question about whether you told me you

3     were going to amend the complaint to add somebody else?  I

4     don't think so.  I don't think so.

5              MR. SWARTZ:  Your Honor --

6              THE COURT:  I don't think so.  I don't think so.

7              MR. SWARTZ:  If I may, I believe that that would

8     require him to answer a question that would reveal --

9              THE COURT:  I said I don't think so.

10             MR. SWARTZ:  -- communications between us.

11             THE COURT:  I don't think so.

12             Did you know that your lawyer told me that he was

13    going add Mr. Digilov?  Did you know that?

14             THE WITNESS:  No.

15             THE COURT:  He did not know that.  He did not know

16    that.  Okay, next question.

17    BY MR. LINTHORST:

18    Q.  Did you know that your lawyer told the judge that you

19    intended to add a class action claim under New York State Law

20    for overtime and to amend your complaint to do that?

21    A.  Yeah, that was discussed because I believed that all the

22    ABMs are the same like under -- not paid, not compensated for

23    their overtime.

24             THE COURT:  I know what counsel said to me.

25             Counsel said to me he was going add a claim to include

E9MJVARH                        Varghese - cross

1   Mr. Digilov.  Counsel said to me he was going to add a class

2   action claim.  I know that.  We were all in the room when it

3   happened.  It is not a secret.

4          I am much more interested in the fact this gentleman

5   is being asked to give up his claim without having any idea

6   what its value is.  Do you think I will accept that?  I won't

7   accept that.  I wouldn't accept that for one second.  He has no

8   concept of what the value of his claim is.  I won't let him

9   withdraw, not until he has some concept of what the value is.

10          Are there Any other questions you would like to ask

11  him?

12          MR. LINTHORST:  Yes, your Honor.

13  BY MR. LINTHORST:

14  Q.  At some point, Mr. Varghese, did you retain additional

15  lawyers in addition to Mr. Stoecker?

16  A.  No.

17  Q.  Did you retain the law firm of Outten & Golden and Mr.

18  Swartz and Ms. Aaron?

19  A.  I mean they were relating, I am certainly aware of the

20  discussion --

21          THE COURT:  The question was, did you also, in

22  addition to hiring Mr. Stoecker to be your lawyer, did you also

23  hire the Outten law firm to be your lawyers?

24          MR. STOECKER:  Objection, your Honor.

25          THE COURT:  Excuse me.  Sit down.  I am asking him if

1    he retained the Outten firm to be his lawyers.  Sit down.  It

2    is a perfectly proper question.

3              MR. STOECKER:  Your Honor, if I --

4              THE COURT:  Your objection is noted.  You have no

5    valid objection.  Did you retain the Outten firm to be your

6    lawyers, yes or no?  Did you?

7              THE WITNESS:  Yes.

8              THE COURT:  Did you?

9              THE WITNESS:  Yes.

10             THE COURT:  You did?

11             THE WITNESS:  Yes.

12             THE COURT:  Thank you.

13   BY MR. LINTHORST:

14   Q.  Did you retain anyone else to be your lawyer besides Mr.

15   Stoecker and the Outten & Golden firm?

16   A.  No.

17   Q.  Do you know who John Beranbaum of the law firm of Beranbaum

18   & Menken is?

19   A.  Who?

20   Q.  John Beranbaum of the law firm Beranbaum & Menken?

21   A.  No.

22   Q.  Did you ever retain him to be your lawyer?

23   A.  No, no, not directly.

24   Q.  Are you aware of your lawyers ever telling the court that

25   you had retained Mr. Beranbaum as your lawyer?

1   A.  I am not sure if they mentioned it or not.

2   Q.  If they mentioned it, it would have been inaccurate because

3   you did not retain them as your lawyer?

4           MR. SWARTZ:  Objection; attorney-client privilege?

5           THE COURT:  Overruled.  He asked what he did, whether

6   he retained someone as the lawyer.

7           MR. SWARTZ:  I understand, your Honor, but counsel's

8   question, I believe, was --

9           THE COURT:  The question is, if anybody said you hired

10  them, that person was lying, right?

11          "If anybody said," which doesn't say anything about

12  what you said to him, if anybody told me you hired this

13  Mr. Beranbaum, that person would not have been telling the

14  truth.  Is that correct?

15          THE WITNESS:  I did not directly, but we had a

16  discussion for him.  I am not sure.

17          THE COURT:  You don't know whether he was hired?

18          THE WITNESS:  I don't recall.

19          THE COURT:  Fine.  You personally didn't do the

20  hiring?

21          THE WITNESS:  I personally didn't.

22          THE COURT:  Fine.

23  BY MR. LINTHORST:

24  Q.  Do you know if Mr. Beranbaum represents you today?

25  A.  I mean that was the attorney part of this.  That is all I

E9MJVARH                         Varghese - cross

1   know.  I didn't ask any --

2   Q.  You don't know whether Mr. Beranbaum represents you today?

3               MR. SWARTZ:  Objection.  He testified he doesn't know

4   who Mr. Beranbaum is.

5               THE COURT:  The objection is sustained.  I get the

6   picture.  Move on.

7   BY MR. LINTHORST:

8   Q.  You're aware that there was a conference, initial

9   conference with the court on June 6th of this year, correct?

10  A.  Pardon me?  Can you rephrase that.

11  Q.  Sure.  You're aware that there was an initial conference in

12  this case with the court on June 6th?

13  A.  I don't know the date, but there was a conference, yes.

14  Q.  Are you aware that at that conference, your attorney asked

15  to file --

16              THE COURT:  He wasn't at the conference.  He wasn't at

17  the conference.  What is relevant to me is if this man

18  understands what he is giving up.  It is quite clear he does

19  not.

20              There is no attorney-client privilege that is

21  attendant to that because I will not accept his withdrawal

22  until I am confident that he knows what he is giving up.  If

23  that requires him to reveal communications he had about the

24  value of his claim with his lawyer, then he has no choice but

25  to do that.

1          MR. STOECKER:  If I may?

2          At the initial conference your Honor precluded

3     discovery on damages and --

4          THE COURT:  You have some concept of what his claim

5     is.  You know what he made, presumably what every other client

6     in this case got.  He told you, gave you an estimate of how

7     much overtime he worked, and you know what the law is.  You

8     know how to calculate time and a half.  You know what the

9     double damages and the triple damages are for double and triple

10    willful evasion.  You know all of this stuff.  You don't need

11    discovery to give the man an estimate of what his claim is

12    worth.

13         MR. STOECKER:  Well, your Honor, what I said to him is

14    attorney-client privilege.

15         THE COURT:  I am telling you until I am satisfied that

16    he has some concept of the general value of his claim, which he

17    can get without discovery, I am not letting him withdraw it,

18    okay?

19         THE WITNESS:  Your Honor --

20         THE COURT:  I have to be satisfied.  I have to know.

21    I have to know.

22         THE WITNESS:  -- your Honor --

23         THE COURT:  You be quiet.  You be quiet.

24         MR. SWARTZ:  Are you talking to me?

25         THE COURT:  I am talking to your client, who is trying

E9MJVARH                      Varghese - cross

1    to interrupt and talk, which you don't want him to do.

2            MR. SWARTZ:  Thank your Honor.

3            Would you allow an adjournment so we can talk to our

4    client and I can satisfy the --

5            THE COURT:  I have to tell you, it is so outrageous

6    you have come in here today.  We all know you're trying to get

7    the case away from me, although I am telling you I don't know

8    what difference it makes that it is me or that it is somebody

9    else because the law is the law, and Pippin been affirmed.  We

10   all know what the game is here.  We all know what this case is

11   about.  It is about whether the facts of assistant branch

12   managers fall closer to some other line, right?

13           From the first day you have done everything in your

14   power to get this case away from me.  Well, now you're trying

15   to do it by getting this man to give up his claim to a lot of

16   money.  Six figures is my guess.

17           How much do you make now, sir, as a mail clerk?

18           THE WITNESS:  As a mail clerk, I make like around

19   $17.00.

20           THE COURT:  $17.00 an hour?

21           THE WITNESS:  Yes.

22           THE COURT:  A lot of money, and you have come in here

23   and you essentially acknowledge to me that you have not had a

24   conversation with your client, whose claim you are proposing to

25   compromise, about the potential value of his claim?

E9MJVARH                        Varghese - cross

 1              That is outrageous!  It is malpractice!  It is
 2   unethical!  It suggests to me that your firm, for which I have
 3   had the greatest respect for for many, many years should not be
 4   allowed to represent clients in cases like this, that you would
 5   walk into this hearing knowing that it was called for the
 6   purpose of me satisfying myself that this gentleman understood
 7   the ramifications of his decision.
 8              MR. SWARTZ:  Your Honor, Mr. Varghese testified that
 9   he believes his claim is worth more than $20,000.  Your Honor,
10   I did not acknowledge we did not have a conversation with him
11   about it.  That would be protected by the attorney-client
12   privilege whether we did or not.
13              At the initial conference -- and this is not to reveal
14   any conversations that we had with our client -- at the initial
15   conference the court said that it is not just this case is like
16   Pippin, where it is not, different exception, different job
17   title.  Pippin is not controlling on this case, the
18   professional exception.  It has very little to do with this
19   case.  Your Honor, the court did mention Pippin at the initial
20   hearing.
21              THE COURT:  I did.
22              MR. SWARTZ:  He court mentioned Rule 11 at the
23   hearing.
24              THE COURT:  I always mention Rule 11 at initial
25   hearings.

1            MR. SWARTZ:  I think that what we are here for,

2       Mr. Varghese doesn't want to be in this case any more.

3            THE COURT:  No.  You do not want to be in front of me

4       any more.

5            MR. SWARTZ:  Whether I want to or not is not relevant.

6            Mr. Varghese doesn't want to be in this case any more.

7       He made the decision not to.  We are here representing him,

8       trying to effectuate his wishes not to be in front of the court

9       any more.

10           THE COURT:  His wishes are dictated by the fact that

11      he undoubtedly, at your bidding, found out that I was a mean

12      judge.

13           MR. SWARTZ:  That is not --

14           THE COURT:  As far as I am concerned, this hearing is

15      over.  I am not allowing this man to withdraw his claim until

16      such time as he is willing to testify in front of me that he

17      has an idea of the value of his claim and that he is willing to

18      give up that much money.  We are not going to do that today

19      because it is not possible for him to think about that today,

20      for him to consult with whoever he has to consult with to get

21      some notion of what the potential value of his claim is.

22           If you are correct that this case is not Pippin, but

23      it is a different case because it is the administrative

24      exception rather than professional exception, believe me, I

25      know that.  If you're absolutely convinced, then you know what

1    this gentleman's claim is worth.  He was making $61,000 a year.

2    That is a pretty high hourly rate times one and a half times,

3    times two or three depending on whether we are operating under

4    state or federal law for willfulness.  That is a big sum for a

5    man who is making $17.00 an hour.

6         If you don't care that he understands what he is

7    doing, I care.  I actually care.

8         MR. SWARTZ:  You make serious accusations about us and

9    our firm, and I would like a chance to respond to this.  May I?

10   I don't want to respond if I don't have permission.

11        May I please respond?

12        THE COURT:  You may say anything that you like.

13        MR. SWARTZ:  Your Honor, under Rule 41, a plaintiff

14   can dismiss his case with prejudice under almost any

15   circumstances.  Those circumstances are met here.  In

16   Mr. Varghese's declaration he testified that he did research

17   independently of legal advice, separate from any of us, either

18   Mr. Stoecker's firm or us.

19        THE COURT:  I haven't heard that.  I am not interested

20   in his declaration.  I am interested in what he says here

21   today.  Everything has to get fleshed out.  Who did he talk to?

22   What did that person say?  I need to know that he understands

23   the value of his claim.

24        MR. SWARTZ:  Your Honor --

25        THE COURT:  I need to know nobody is paying him

1    anything under the table to get him to drop the lawsuit.

2            MR. SWARTZ:  Mr. Varghese's declaration is very clear

3    nobody is paying him under the table.  Your Honor, I thank you

4    for the words you said about your law firm.  Our law firm would

5    never do anything like that.

6            THE COURT:  It would have been out of the question for

7    me ever to have thought such a thing.

8            MR. SWARTZ:  I hope you continue with that.  Our law

9    firm does things the right way.  In this case, I don't want to

10   invade or reveal any attorney-client privileged conversations,

11   but I will note Mr. Varghese did just testify that he estimates

12   his claim --

13           THE COURT:  No.  He has testified -- let me be very

14   clear -- he testified he has no idea what his claim is worth.

15   He thinks it probably is worth more than $10,000.00.  He didn't

16   say 20.  He didn't have an opinion.  He didn't have an opinion

17   about 20.  He thinks his claim is worth more than $10,000.00.

18           I am telling you I am not prepared to go forward

19   today.  I am not prepared to go forward until this gentleman

20   has been given, until I am satisfied this gentleman has been

21   given some realistic estimate of what his claim is worth, and

22   he is prepared to say that number and he is prepared to say

23   that I'll give up -- I am making $17.00 an hour and who, as we

24   all know, doesn't carry the laboring oar in these lawsuits.

25           You do!

1           MR. SWARTZ:  I understand.

2           THE COURT:  And he is willing to say, "and I am

3    willing to give that money up."

4           MR. SWARTZ:  I understand.

5           THE COURT:  That is very important to me because this

6    is a real human being here, all right?  This is not an

7    abstraction.  This is a real human being, no doubt with a real

8    family to support with real obligations in this world.  He sat

9    here today and said, "I believe in my claim today."

10          So I am not letting him withdraw it.  You can take it

11   to the Circuit, and they can mandamus me and force me to let

12   him give it up with no concept that he knows what it is he is

13   giving up.  I feel some obligation to protect him.

14          MR. SWARTZ:  I understand and respect that.

15          That is only part of the equation when somebody

16   decides to drop their claim, what the value is.  I understand

17   why your Honor wants to know his understanding what the value

18   is.  The other part of the equation, your Honor, is his

19   understanding, his belief in his chances to succeed.  He has

20   testified here today that he doesn't believe that he will be

21   able to succeed in his claim before the court.

22          THE COURT:  He has testified that I am unfair, that I

23   have prejudged his claim and there is no way that he could

24   possibly prevail.  The Outten firm is actually making that

25   claim about me?

1              MR. SWARTZ:  No, your Honor, I am not.

2              THE COURT:  Really?  You're not making that claim?

3              MR. SWARTZ:  That is not what Mr. Varghese said.  At

4   the initial conference it would be reasonable for somebody to

5   hear what you said at the initial conference and believe he

6   didn't have a fair shot.

7              THE COURT:  He wasn't there.

8              MR. SWARTZ:  You said at the initial conference, your

9   Honor, something to the effect of what is it these days

10  everybody wants overtime.

11             To hear something like that would be, it would be

12  reasonable for somebody to say I don't want to spend --

13             THE COURT:  I have probably 60 or 70 FSLA cases,

14  including a number of cases where your firm and others are

15  seeking to push the edge of the envelope as to who is covered

16  by overtime.  It is an interesting phenomenon.  It is the new

17  trend in litigation.

18             I did, indeed, make that observation.  I have not

19  prejudged this case.  I am insulted that you think so.  Your

20  firm, as far as I am concerned, has impugned my integrity as a

21  judge.

22             MR. SWARTZ:  That is not my intention.

23             THE COURT:  You just did.  It cannot possibly be your

24  intention to have done anything else.  You have poisoned this

25  gentleman.  You have told him I won't give him a fair hearing.

E9MJVARH                    Varghese - cross

1          MR. SWARTZ:  I can't talk about what we told him.

2          THE COURT:  Of course you can't talk about it.  He has

3     already told me.

4          MR. SWARTZ:  I can say that we tried to withdraw the

5     case without saying anything like that about what the court

6     said.  We put in our motion, we sent his declaration to you

7     separately.  We didn't put in any information about what he

8     just said but, your Honor, I hope the court can understand that

9     when somebody like Mr. Varghese is making a decision about

10    whether to continue a case, it is a reasonable thing for him to

11    do to gather information and make a decision based on that.

12         THE COURT:  So far he hasn't gathered the most

13    important decision of all, which is how much money he is

14    leaving on the table because his lawyers told him I would not

15    be fair to him.  Well, guess what?  I am the one in this room

16    who is being fair to him now.

17         I want to make perfectly sure that this gentleman, who

18    is now making $17.00 an hour, understands how much money he is

19    potentially leaving on the table.

20         MR. SWARTZ:  I can't respond to the court's comments

21    about what we told him but, your Honor, I regret that the court

22    feels that way.

23         THE COURT:  You regret that I feel that way?

24         When this lovely gentleman gets on the stand and says

25    I did some research about you, and from what I found out, I was

1  alarmed, I was alarmed?

2        Possibly he could be alarmed at the current state of

3  the law in these edge-of-the-envelope cases, which a number of

4  them have been unsuccessful, including one in which I had a

5  substantial amount of involvement.  It is not the only one that

6  has been unsuccessful, but you all are free to continue to push

7  at the edge of the envelope.  That is why you're in business.

8  That is why you're lawyers, okay, but to suggest -- and you

9  did, I have no doubt -- that I would be unfair to this

10  gentleman is an appalling breach on your part of the trust that

11  I have always enjoyed with the lawyers in your firm, none of

12  whom I have ever had the slightest complaint about for many,

13  many years.

14        MR. SWARTZ:  May hands are tied because I can't

15  respond to what you're saying about what I told Mr. Varghese.

16        THE COURT:  Believe me, I represented a lawyer many

17  years ago who found himself in exactly the same spot with a

18  very, very angry Judge Carter.

19        MR. SWARTZ:  Your Honor, it is a plaintiff's lawyer's

20  job to advise his client throughout the litigation.  I can't

21  tell you what I told Mr. Varghese, but I would be not doing my

22  job if I didn't give him advice throughout the case.

23        THE COURT:  I tell you what I think you should do.

24        First of all, I think that you should give him the

25  advice that he really needs in order to talk with his wife, his

E9MJVARH                        Varghese - cross

1    children, the members of his family, his friends to decide

2    whether he wants to give up the possibility of that much money.

3    If I were you, I would talk to some senior lawyers in the firm.

4              MR. SWARTZ:  I am a senior lawyer in my firm, your

5    Honor.  Mr. Varghese got independent legal advice that is in

6    his declaration.  If the court doesn't want to accept his

7    declaration, I --

8              THE COURT:  I can't accept his declaration because it

9    is perfectly obvious that he doesn't have a clue about the

10   potential value of his claim, all right?  I came in here to be

11   sure he understood what he was giving up.  He doesn't.  That is

12   clear from his testimony.  It is clear from his testimony.

13             I have a better idea and you have a better idea of the

14   value of his claim, the potential value of his claim going back

15   six years under state law, three years under federal law with

16   double and triple.  We both, we all have a better idea of his

17   claim than he does.

18             I am not prepared to allow him to withdraw a claim

19   that he does not understand.  I can't do it.  It is not fair to

20   him, so that you can go and file the lawsuit somewhere else

21   with somebody else, with a different plaintiff, leaving him as

22   road kill.

23             MR. SWARTZ:  We don't see it that way, your Honor.

24             THE COURT:  Well, I don't know how else to see it.

25             MR. SWARTZ:  Respectfully, the way we would like the

1    court to see it is Mr. Varghese doesn't want to be in his

2    lawsuit any more.  He wants to be out of the lawsuit.  The law

3    is clear under Rule 41, voluntary dismissal with prejudice,

4    there are almost no grounds to deny it.

5             If your Honor would like to adjourn the hearing and

6    reconvene, we would be glad to do that.  No matter what,

7    Mr. Varghese does not want to be part of this lawsuit.  He has

8    instructed us to take steps to end it and get him out.  That is

9    what we are doing.  We are effectuating his wishes, your Honor.

10            THE COURT:  We better adjourn the hearing because I

11   have told you that as long as the state of his understanding is

12   what it is today, I am not, in a representative case where he

13   has no concept of the value of his claims.

14            And where, by the way, and where, by the way, in terms

15   of state law claims, the tolling of the statute of limitations

16   will be undone and other people will lose their claims as well.

17            When shall we reschedule this?

18            THE WITNESS:  May I talk?

19            THE COURT:  No, no, you may not.

20            THE CLERK:  October 17th.

21            THE COURT:  Are we on trial then?  We should do it

22   next week.

23            MR. STOECKER:  I won't be available next week.

24            THE CLERK:  You have a trial on October 1st.

25            (Off-the-record discussion)

1          THE COURT:  The week of the 20th.  Let's make it the

2    22nd, at 10:00 am.

3          MR. SWARTZ:  One of the purposes of this hearing was

4    for the court to determine whether Mr. Varghese may have been

5    offered anything in order to withdraw his claims.  I maybe

6    incorrectly assumed your Honor would accept his declaration,

7    and so may I make a record about whether the answer --

8          THE COURT:  He is in the middle of cross right now,

9    but you may make a record when we resume the hearing, okay?

10         I'll see you then.

11         MR. LINTHORST:  May I ask a question about the current

12   discovery schedule?  We have a cutoff of October 3rd.

13         THE COURT:  Everything is on suspense right now as far

14   as I am concerned.

15         MR. LINTHORST:  Thank your Honor.

16         THE COURT:  Okay.

17         (Witness excused)

18         (Court adjourned)

19

20

21

22

23

24

25